Joseph W. Cotchett (36324)
Steven N. Williams (175489)
Philip L. Gregory (95217)
Joyce Chang (300780)
Adam J. Zapala (245748)
Stephanie D. Biehl (306777)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
pgregory@cpmlegal.com
jchang@cpmlegal.com
azapala@cpmlegal.com
sbiehl@cpmlegal.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **JOHN WILLIAM KIEFER, III, MATTHEW MITCHELL, SUSAN GONZALEZ-PENDER, and TERESE RUSSELL,** Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiffs,<br><br>vs.<br><br>**QUALCOMM INCORPORATED**, a Delaware Corporation,<br><br>Defendant. | **Case No. _____**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>**1.** Section 2 of the Sherman Act, 15 U.S.C. § 2<br><br>**2.** Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et. seq.*<br><br>**3.** Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*<br><br>**JURY TRIAL DEMAND** |

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION ........................................................... 1

II.   PARTIES ........................................................................... 9

      A.    Plaintiffs ................................................................. 9

      B.    Defendant ............................................................... 10

III.  JURISDICTION AND VENUE ............................................ 11

IV.   INTRADISTRICT ASSIGNMENT ...................................... 12

V.    FACTUAL ALLEGATIONS ............................................... 13

      A.    **Brief Wireless Industry Background: The Necessity of Shared Technical Standards In Order for Wireless Networks to Operate.** ...................................... 13

            1.    Standard Setting Organizations ("SSOs") And the Common Standards They Create For Modern Electronic Devices To Function Properly. ...................................................... 13

            2.    Standard Essential Patents ("SEPs") And The Enhanced Potential For Patent Abuse By SEP Holders In the Cellular Device Industry. ........ 15

            3.    Reasonable and Non-Discriminatory Terms ("FRAND") Prevent Patent Abuse by SEP Holders. ......................................... 18

      B.    **Defendant Qualcomm's Dominance and Abuse of Power in the Cellular Industry** ................................................... 19

            1.    Brief History of the Development of the Wireless Industry ...................... 19

            2.    Qualcomm's Powerful Patent Portfolio in Mobile CDMA and LTE Technologies. ............................................ 21

            3.    Qualcomm's Violation of Its FRAND Promises. ....................... 23

            4.    Qualcomm's Dominance in the Market and Anticompetitive Licensing Practices Inflate the Patent Royalties That It Collects Above Competitive Rates. .................................. 26

                  a.    Qualcomm Controls The Licensing Market For Numerous Technologies. ...................................... 26

                  b.    Qualcomm's Business Structure is Designed to Maintain and Further Entrench Its Unlawful Licensing Power. ................... 27

                  c.    Qualcomm's Royalty Rates Are Significantly Higher Than Others In the Industry. .................................... 30

      C.    **Worldwide Regulatory Action Against Defendant Qualcomm's Widespread Unlawful Royalty Calculations and Licensing Practices** ................ 32

| | | 1. | China | 32 |
| | | 2. | Korea | 33 |
| | | 3. | Taiwan | 34 |
| | | 4. | United States | 34 |
| | D. | **Defendant Qualcomm's Unlawful Monopolistic Conduct Caused Widespread Injury to Plaintiff and the Classes.** | | 35 |

**VI.     ANTITRUST INJURY** ..................................................................... 36

**VII.    MARKET DEFINITION** ................................................................... 37

**VIII.   CLASS ACTION ALLEGATIONS** ................................................. 37

**IX.     CLAIMS AND PRAYER FOR RELIEF** ......................................... 41

**FIRST CLAIM FOR RELIEF**

Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ................. 41

**SECOND CLAIM FOR RELIEF**

Violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et. seq.* ................... 43

**THIRD CLAIM FOR RELIEF**

Violations of Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ............ 44

**X.     REQUEST FOR RELIEF** ................................................................. 46

**JURY DEMAND** .................................................................................... 48

1    John William Kiefer, III, Matthew Mitchell, Susan Gonzalez-Pender, and Terese Russell

2   ("**Plaintiffs**"), on behalf of themselves and all others similarly situated (the "**Class**" as defined

3   below), upon personal knowledge as to the facts pertaining to them and upon information and belief

4   as to all other matters, and based on the investigation of counsel, bring this class action for damages,

5   injunctive relief and other relief pursuant to federal antitrust laws and California antitrust, unfair

6   competition, and consumer protection laws. Plaintiffs demand a trial by jury and allege as follows:

7   **I.    NATURE OF ACTION**

8       1.    This lawsuit is brought against Defendant Qualcomm Incorporated ("**Qualcomm**") –

9   the largest provider of mobile chips in the world[1] – for anticompetitively abusing its monopoly power

10  of modem chipsets in cellular devices throughout the world. ***In doing so, Qualcomm has caused***

11  ***hundreds of millions of unsuspecting consumers to pay supracompetitive prices for these***

12  ***technological devices that are mainstay devices utilized and relied upon ubiquitously around the***

13  ***globe.***



**Image 1:** An example of one of Qualcomm's modem chipsets found in the iPhone 6 device (see orange square). *Source*: http://www.bidnessetc.com/64777-intel-corporation-bags-3040-of-iphone-7-modem-chip-order-clsa/

25      2.    As the dominant player in the world's modem chipset market, Defendant Qualcomm

26  anticompetitively abused its monopoly power over the modem chipset market and abused the

---

[1] *See* Qualcomm's webpage ("Qualcomm becomes world's leading mobile chipset provider…") at https://www.qualcomm.com/company/about/history. Last accessed on February 1, 2017.

intellectual property rights underlying this technology by charging an excessive and unlawful royalty on cellular phones or devices incorporating such patents ("**Cellular Devices**") – resulting in each end-user purchaser of such phones or devices being forced to pay an artificially-inflated price.

3.      Plaintiffs are purchasers of products which use cellular technology, including cellular telephones and computer tablets.

4.      *In every cellular device, there is a modem chipset* (also called a "baseband processor"), *which allows the device to effectively communicate and transmit voice and data across wireless networks* controlled by carriers such as Verizon or Sprint.



**Image 2:** An example of one of Qualcomm's modem chipsets, which is a device in a network interface that manages all the radio functions (*i.e.,* all functions that require an antenna). *Source*:
https://www.extremetech.com/mobile/96267-how-samsungs-chip-change-up-affects-the-t-mobile-galaxy-s2

5.      In order for a Cellular Device to communicate with an operator's network, the device **must** contain this modem chipset that complies with cellular communications standards that the network supports. Together, standard setting organizations ("**SSOs**") – comprised of device and device component developers as well as others – collaborate to set technology requirements to ensure

mass interoperability amongst all system components. Products that use non-standardized technologies are generally commercial failures because consumers need their devices to be able to interact with other individuals' devices.

6.    Since a standard requires that devices utilize a specific technology, standard-compliant devices will – in some cases – infringe on certain technological patents incorporated in the standard. These patents are known as standard essential patents ("**SEPs**"). SEP holders benefit by obtaining licensing fees and royalties associated with use of their technology – use of which is required in order for their cellular product to be interoperable. ***In other words, SEP owners have tremendous power in that they have the ability to demand inflated royalties that, if abused, could severely limit competition, consumer choice, and innovation as a whole.***



**Image 3:** In an effort to prevent antimonopolistic activity, SSOs require developers holding SEPs to abide by FRAND terms. *Source*: http://www.techlaw.attorney/FORUMS/TOPIC/STANDARD-ESSENTIAL-PATENTS-FAIR-REASONABLEAND-NON-DISCRIMINATORY-FRAND-PATENT-LICENSING-TERMS/

7.    Given the significant power such standards may give SEP holders, SSOs consider various alternative technologies before selecting a standard. SSOs also require that the developers of these standards agree to license their technology on fair, reasonable, and nondiscriminatory ("**FRAND**") term as a condition of the inclusion of the patented technology into the standard. ***FRAND terms ensure that competitors may use the SEP's technology rather than being excluded from the market, and that device manufacturers may use the technology without being subjected to***

1  ***unreasonable terms.*** Indeed, an SSO will generally design a standard to avoid using patents whose

2  owners refuse to agree to license them on FRAND terms.

3       8.     One type of standard in the wireless industry is called Code Division Multiple Access

4  ("**CDMA**"), a standard on which network carriers such as Verizon and Sprint rely.[2] Not only was

5  Defendant Qualcomm one of the earliest developers of cellular technology, the company developed

6  the technology underlying the CDMA standard. Qualcomm sold CDMA chips to other manufacturers

7  and licensed CDMA technology to other chip makers – essentially becoming a "one-stop shop for

8  CDMA." ***Today, it is the dominant producer of CDMA chipsets and holds the largest number of***

9  ***SEPs for CDMA technology***.[3]



**Image 4:** Some 2G standards and most 3G standards use CDMA – and Qualcomm is the dominant producer of CDMA chipsets and holds the largest number of SEPs for CDMA technology. *Source*: http://slideplayer.com/slide/7270161/

---

[2] Wireless communications have gone through four (4) generations of wireless standards – referred to as 1G, 2G, 3G, and 4G. There are two (2) main types of 2G and 3G standards – CDMA and GSM/UMTS (based on different types of technology). LTE is the main 4G standard. Qualcomm holds a number of SEPs related to CDMA technology and made written contractual commitments to offer those SEPs on FRAND terms to all licensees.

[3] According to ABI Research, Qualcomm remained a leader in the LTE baseband chipsets in 2015. The company held the massive, lion's share of the market at 65% that year. *See* "Qualcomm Retains Lion's Share of LTE Baseband Market; Further Gains Expected in 2016" at http://www.forbes.com/sites/greatspeculations/2016/02/24/qualcomm-retains-lions-share-of-lte-baseband-market-further-gains-expected-in-2016/#5308d54210f7.   Last accessed on February 1, 2017.

9.     Over time, having agreed to license its technology on FRAND terms, ***Qualcomm's technology has been incorporated into virtually every relevant cellular standard in the last several years.***[4]



**Image 5:** A photo of Google's Nexus 7, Barnes & Noble's Nook HD, Amazon's Kindle Fire HD, and the Apple iPad Mini, all of which contain chipsets.
*Source*: http://techland.time.com/2012/10/25/ipad-mini-kindle-nook-nexus-7-the-pros-and-cons-of-each/

10.     ***However, Qualcomm has not abided by its FRAND promises.*** Instead, the corporation has taken advantage of standard-setting process to acquire and maintain monopoly control of the modem chipset market.

11.     Beginning at least as early as 2008, Qualcomm – among other incidences – (1) refused to license (or alternatively imposed onerous restrictions on licenses of) its SEPs to competing chipset

---

[4] *See* Vlad Savov's "This is Qualcomm's world and we're all just living in it" by The Verge (Nov. 5, 2014) at http://www.theverge.com/2014/11/5/7159559/qualcomms-world (last accessed February 2, 2017). "***Qualcomm is the mobile industry's equivalent of a god: omnipotent and omnipresent, yet invisible to the naked eye. The company that was founded on the premise of building "Quality Communications" can now be found inside every major smartphone in the US.*** Even the fiercely independent Apple, which designs its own mobile processors, has no choice but to use Qualcomm's LTE modems. The same is true of Samsung, whose Exynos chip is replaced by a Qualcomm Snapdragon for the US and other markets. But Qualcomm's influence spreads much wider and deeper still."

makers; (2) conditioned the supply of its CDMA chipsets on agreeing to Qualcomm's ***entire patent portfolio's license agreements***; (3) entered into exclusive deals with certain cellular phone manufacturers such as Apple, Inc. ("**Apple**"); and (4) most egregiously, ignored the requirements of SSOs to license its SEPs to patent users on FRAND terms in order to successfully extract unreasonably high, unilaterally-determined royalty payments.

12.    Additionally, whereas the common calculation of a royalty for SEP technology is based on the value of the individual component containing that technology, Qualcomm insists on royalties that are based on the price of the entire finished device. ***This results in Qualcomm obtaining additional royalties even where its technology does not contribute to the increased price of the device.***

13.    For example, the latest model iPhone (iPhone 7) comes with three different storage capacity options: 32G, 128GB, and 256 GB. These phones cost approximately $649, $749, and $849, respectively. Qualcomm's modem chipset has nothing to do with the increased price that comes with greater storage capacity in these phones – yet absent an agreement providing Apple with relief from the royalty, Qualcomm would nonetheless collect a larger royalty on the higher capacity models simply because their SEP technology is included in that device.

| DEVICE | NO-COMMIT RETAIL PRICE |
|---|---|
| | |
| iPhone 7 32GB | $649.99 |
| iPhone 7 128GB | $749.99 |
| iPhone 7 256GB | $849.99 |
| iPhone 7 Plus 32GB | $769.99 |
| iPhone 7 Plus 128GB | $869.99 |
| iPhone 7 Plus 256GB | $969.99 |

**Image 6:** Prices for Apple's iPhone 7 devices increase respectively with the devices' storage capability. This has nothing to do with Qualcomm's technology, yet Qualcomm extracts a larger royalty on the higher capacity models simply because their technology is included in the phone.
*Source*: https://www.slashgear.com/iphone-7-preorder-and-carrier-pricing-round-up-08455349/

14.     Indeed, Qualcomm admits in its June 29, 2016 Form 10-Q filed with the Securities & Exchange Commission ("**SEC**") that "[r]oyalties are generally based upon a percentage of the wholesale (*i.e.,* licensee's) selling price of complete licensed products, net of certain permissible deductions (including transportation, insurance, packing costs and other items)."[5] Qualcomm typically charges makers of 3G devices—and 3G-compatible 4G models—up to 5% of their products' wholesale price – *which amounts to approximately $30 on every $600 phone.*

15.     Furthermore, Qualcomm coerces manufacturers to agree to its onerous royalty provisions through its "no license, no chips" policy – a condition that other suppliers of semiconductor devices do not impose – wherein  Qualcomm refuses to provide manufacturers with essential model chipsets unless and until they agree to Qualcomm's licensing unilateral terms. Manufacturers also must pay elevated royalties when using a competitors' processors. "The risk of losing access to Qualcomm baseband processors is too great for a cell phone manufacturer to bear because it would preclude the manufacturer from selling phones for use on important cellular networks."[6]

16.     Since Qualcomm's licensing terms apply also to cellular devices that do not use Qualcomm's modem chipsets, Qualcomm is also able to collect a "tax" from the entire cellular device manufacturing industry – causing a ripple effect of universal inflated prices for consumers throughout the world.

17.     Plaintiffs and the class of persons they seek to represent have been harmed by paying supracompetitive prices for the Cellular Devices they purchased. Qualcomm has now "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits. *Qualcomm charges a royalty on nearly every smartphone made, whether or not the device*

---

[5] *See* Qualcomm's Annual Report (SEC Form 10-K) for the fiscal year ending September 27, 2015 at pages 10-11 at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-15-271&CIK=804328. Last accessed on February 6, 2017.

[6] *See* TechCrunch's "Qualcomm faces FTC charges over monopolistic 'no license, no chips' claim" by Brian Heater (Jan. 17, 2017) at https://techcrunch.com/2017/01/17/qualcomm-3/. Last accessed on February 7, 2017.

*uses its chips… [a]s a result, Qualcomm has reaped more than $50 billion in licensing revenues since 2000*" (emphasis added). [7]

18.    Qualcomm's unlawful conduct has not been only limited to the United States. Indeed, Qualcomm's anticompetitive conduct has been met with severe condemnation and substantial fines by regulators around the world.

(a) On September 9, 2009, the Japan Fair Trade Commission ("**JFTC**") issued a cease and desist order against Qualcomm because of the violation of its FRAND obligations in a manner that strengthens Qualcomm's already influential position in the CDMA market and "thereby tending to impede fair competition in the technology market;"[8]

(b) On February 10, 2015, after a 14-month government investigation into the company's anticompetitive practice, China's National Development & Reform Commission ("**NDRC**") concluded that Qualcomm had abused its monopoly power and restricted competition in violation of the country's Anti-Monopoly Law, *fining Qualcomm $975 million* – the largest in China's corporate history;

(c) On December 21, 2016, the Korea Fair Trade Commission ("**KFTC**") *fined Qualcomm $854 million (the largest fine ever levied in its history)* for Qualcomm's abuse of its market dominance and restrictive, anticompetitive conduct with respect to its licensing practices.

19.    Additionally, just last month, the United States Federal Trade Commission ("**FTC**") filed an enforcement action against Qualcomm in this Court challenging Qualcomm's unlawful maintenance of a monopoly with respect to baseband processors and alleging that Qualcomm has excluded competitors and harmed competition – resulting in increased prices paid by consumers for

---

[7] *See* Don Clark's "Qualcomm's Main Profit Driver is Under Pressure," by The Wall Street Journal (Apr. 13, 2015) at https://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051 (last accessed on February 2, 2017).

[8] *See* Japan Fair Trade Commission's September 30, 2009 Press Release: "Cease and Desist Order Against Qualcomm Incorporated" at http://www.jftc.go.jp/en/pressreleases/yearly-2009/sep/individual-000038.html. Last accessed on February 7, 2017.

cellphones and tablets. *Federal Trade Commission v. Qualcomm Inc.,* Case No. 17-cv-00220 (filed N.D. Cal. Jan. 17, 2017) ("**FTC Complaint**").

20.     Plaintiffs bring this action on behalf of themselves and others similarly situated to recover for their injuries resulting from Qualcomm's violations of Section 2 of the Sherman Act, as well as violations of state antitrust and consumer protection laws, from January 17, 2013 through the present ("**Class Period**"). Plaintiffs seek monetary damages, injunctive relief, and any other available remedies to which they are entitled for Qualcomm's unlawful conduct.

## II.     PARTIES

### A.     Plaintiffs

21.     Plaintiff **JOHN WILLIAM KIEFER, III** is a California resident who purchased an Android Cellular Phone and a Verizon Tablet containing a Qualcomm modem chipset, which is similar to all Cellular Phones and Tablets subjected to having a Qualcomm modem chipset, during the respective Class Period for his own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because he paid a higher price than he would have in the absence of Defendant's conduct as alleged herein.

22.     Plaintiff **MATTHEW MITCHELL** is a California resident who purchased an iPhone 6 containing a Qualcomm modem chipset, which is similar to all Cellular Phones subjected to having Qualcomm modem chipsets, during the respective Class Period for his own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because he paid a higher price than he would have in the absence of Defendant's conduct as alleged herein.

23.     Plaintiff **SUSAN GONZALEZ-PENDER** is a California resident who purchased a Chevrolet vehicle equipped with OnStar containing Qualcomm modem chipsets, which is similar to all automobiles equipped with OnStar subjected to having a Qualcomm modem chipset, during the respective Class Period for her own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because she paid a higher price than she would have in the absence of Defendant's conduct as alleged herein.

24.     Plaintiff **TERESE RUSSELL** is a California resident who purchased multiple iPhone devices, an iPad, an Amazon Kindle, and an Amazon Fire Tablet, all containing Qualcomm modem

chipsets, which is similar to all Cellular Phones and Tablets subjected to having Qualcomm modem chipsets, during the respective Class Period for her own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because she paid a higher price than she would have in the absence of Defendant's conduct as alleged herein.

**B.**    **Defendant**

25.    Defendant Qualcomm Incorporated ("**Qualcomm**") is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm is an American multinational semiconductor and telecommunications equipment company that designs and markets wireless telecommunications products and services. A major portion of Qualcomm's licensing goes through the Bay Area as it has extensive offices and employees throughout this District, including in San Francisco, Santa Clara, and Alameda counties, and regularly conducts business here. Many of its licensees are also located in this District.



**Image 7:** A view of Qualcomm's Santa Clara offices.

26.    Qualcomm develops, designs, licenses, and markets worldwide its digital communications products and services primarily through its two main business segments: Qualcomm CDMA Technologies ("**QCT**") and Qualcomm Technology Licensing ("**QTL**"). QCT deals with equipment sales while QTL engages in licensing of patents and technology. QCT, a wholly-owned subsidiary of Qualcomm, is operated by Qualcomm Technologies, Inc. ("**QTI**"), another wholly-

owned subsidiary of Qualcomm. QTL, a third wholly-owned subsidiary of Qualcomm, grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.

## III.    JURISDICTION AND VENUE

27.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 16, for Defendant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section Three of the Clayton Act, 15 U.S.C. §§ 1331 and 1337.

28.    Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against defendants for violation of those state laws. Plaintiffs and the Class also seek attorneys' fees, costs, and other expenses under federal and state laws. The Court has supplemental jurisdiction over these pendent state law claims under 28 U.S.C. §§ 1332(d) and 1367.

29.    This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1137. This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

30.    This Court has *in personam* jurisdiction over Defendant because Defendant: (a) is headquartered in and has its principle place of business in California; transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Cellular Devices throughout the United States, including in this District; (c) engaged in the conduct alleged herein in violation of the law that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendant also conducts business throughout the United States, including in this District, and it has purposefully availed itself of the laws of the United States.

**CLASS ACTION COMPLAINT**                                                                                                 11

31.     Defendant engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

32.     The activities of Defendant were within the flow of, were intended to, and did have, a substantial effect on interstate commerce in the United States. Defendants' products are sold in the flow of interstate commerce.

33.     By reason of the unlawful activities hereinafter alleged, Defendant substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Class. Defendant, directly and through its agents, engaged in activities affecting all states that artificially and illegally increased the cost of Cellular Devices, which conduct unreasonably restrained trade and adversely affected the market for such Cellular Devices.

34.     Defendants' wrongdoing described herein adversely affected individuals and entities in the United States, including Plaintiffs and members of the Class, who purchased Cellular Devices.

35.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here. Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

## IV.    <u>INTRADISTRICT ASSIGNMENT</u>

36.     Pursuant to the Northern District of California's Civil Local Rule 3-2(c) – (e), the intradistrict assignment should be to the San Jose division. This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County.

37.     Additionally, Qualcomm has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading cell phone manufacturers (also known as "**original equipment manufacturers**" or "**OEMs**") and Qualcomm competitors, also have offices in Santa Clara County.

38.     Moreover, as noted above in ¶ 19, the FTC filed a case in the San Jose Division concerning the practices at issue here. *Federal Trade Commission v. Qualcomm Inc.,* Case No. 17-cv-00220 (filed N.D. Cal. Jan. 17, 2017).

## V.     FACTUAL ALLEGATIONS

### A.     Brief Wireless Industry Background: The Necessity of Shared Technical Standards In Order for Wireless Networks to Operate.

#### 1.     Standard Setting Organizations ("SSOs") And the Common Standards They Create For Modern Electronic Devices To Function Properly.

39.     In this modern day and age, the critical foundation for electronic devices to function are interoperability and compatibility.



**Image 8:** Defendant Qualcomm offers mobile users the key to connectivity.
*Source*: Qualcomm's June 2014 PowerPoint Presentation: "The Evolution of Mobile Technologies."

40.     Although device users may take for granted that their cellular devices will simply be able to connect wirelessly to their cellular network and the Internet, interoperability does not happen naturally on its own. Rather, each component of a cellular network (such as those operated by AT&T, Verizon, and Sprint), and each component of mobile wireless devices utilizing that cellular network, must be equipped with components that are able to sync with other components – regardless of which company manufactured each component.



**Image 9:** Defendant Qualcomm's image demonstrating their ability to deliver seamless interworking.
*Source*: https://www.qualcomm.com/invention/technologies/lte/lte

41.    To that end, each cellular device contains a "<u>modem chipset</u>," which is commonly also referred to as a baseband processor. The modem chipset is the core electronic unit that allows the device to transmit and receive information (for example, telephone calls or data) to and from the wireless network. In other words, the modem chipset is the key to interoperability and compatibility amongst networks and mobile devices.



**Image 10:** An example of a modem chipset manufactured by Qualcomm that aids with the seamless transmission of information in cellular devices.
*Source*: http://appleinsider.com/articles/15/01/20/after-eating-intel-apple-could-next-devour-qualcomms-baseband-processor-business

42.    Specifically, these chipsets transmit information – via radio waves – to cellular base stations. In turn, base stations transmit the information to and from telephone and computer networks.

In order for this process to work properly, it is essential that all components involved in the transmission of information be able to communicate seamlessly with one another.

43.     Given the host of devices, device designers, component manufacturers, and others involved in the process, every player must follow uniform standards to ensure the smooth transmission of data between the cellular network and the cellular devices that connect to it.

44.     To achieve this, cellular network carriers, chipset manufacturers, cellular device manufacturers, and others involved in the process have standard setting organizations ("**SSOs**") that create universal standards and technical specifications for each involved party to follow. Some SSOs include the European Telecommunications Standard Institute ("**ETSI**"), the International Telecommunications Union ("**ITU**"), and the Institute of Electrical and Electronic Engineers ("**IEEE**").



**Image 11:** Qualcomm's image of how they support true heterogeneous wireless networks and how the user's device – and correspondingly, Qualcomm's modem chipset – is at the center of it all.
*Source*: https://www.qualcomm.com/invention/technologies/lte/lte

> **2.     Standard Essential Patents ("SEPs") And The Enhanced Potential For Patent Abuse By SEP Holders In the Cellular Device Industry.**

45.     In setting these universal standards for parties to follow, SSOs also declare patents that might be essential to those standards ("**standard essential patents**" or "**SEPs**"). The technology incorporated into a standard is typically chosen from amongst many different options. Once incorporated and widely adopted, that technology is used not always because it is the best or the only

option, but because the use of that technology has become necessary in order to comply with the agreed-upon standard. Therefore, competition within that technology market is eliminated because competing technologies are no longer needed or available as an alternative means of implementing the standard.

46.    Additionally, to implement a technological standard, devices often need to utilize a patented invention – SEPs – on which the standard is based. Since patent holders of technology essential to a standard declare their patents as SEPs, manufacturers of products containing the patented technology need to license the SEP in order to comply with a particular standard requiring the technology.

47.    Under certain circumstances, collaboration by participants in an industry can increase competition, product innovation, product quality, and consumer choice.  For example, collaboration amongst participants in the wireless industry allows consumers to have confidence that devices bought from different manufacturers will work with each other and with the cellular network that they choose. By the same token, shared standards allow component manufacturers, carriers, and others in the industry to freely invest in technological advancement with the understanding that their billions of devices and products will be able to operate with wireless networks.

**Image 12:** Qualcomm's image of how the mobile experience is expanding everywhere.
*Source*: Qualcomm's June 2014 PowerPoint Presentation: "The Evolution of Mobile Technologies."

48.     However, standards can also pose challenges to manufacturers and can involve downsides for consumers.  For example, a company implementing standards in a product must use certain mandated technologies, even where many viable – and perhaps even superior – options exist. Once a standard is adopted, participants begin to make investments tied to the implementation of the standard.  ***Because these participants may face considerable switching costs in abandoning initial designs and instead substituting an alternative technology, an entire industry can become essentially "locked-in" to a standard.***

49.     Another example of a challenge is potential patent abuse via "<u>patent hold-up</u>," which occurs when an SEP-holder demands excessive royalties after companies are locked into using a particular standard (that implements that SEP). The adoption of SEPs into technological standards increases the risk of abuse by the patent owner because ***where standardized technologies are covered by patents, companies that choose to implement a standard have no choice but to either license those patents (and accept the licensor's terms) or face liability for using licensed technology without a license.***

50.     Another example of a challenge is "<u>royalty stacking</u>," where a standard uses numerous patents and these royalty payments "stack" on top of each other and, in turn, inflate the cost of the product to the consumer. Not surprisingly, royalty stacking also exacerbates the holdup problem because put simply, the magnitude of the problem is multiplied by the number of patents that read on the product.[9] Indeed, royalty stacking is a major concern:

> ***The data show that royalty stacking is not merely a theoretical concern.*** Indeed… potential patent royalties in excess of $120 on a hypothetical $400 smartphone—which is almost equal to the cost of device's components. Thus, the smart phone royalty stack across  standardized and non-standardized technology is significant, and those costs may be undermining industry profitability—and, in turn,  diminishing incentives to invest and compete.[10] (emphasis added).

---

[9] Mark A. Lemley and Carl Shapiro, "Patent Holdup and Royalty Stacking," Texas Law Review Vol. 85, 2007 at page 2011.

[10] Ann Armstrong, Joseph J. Mueller, and Timothy D. Syrett's "The Smartphone Royalty Stack: Surveying Royalty Demands for the Components Within Modern Smartphones" at https://www.wilmerhale.com/uploadedFiles/Shared_Content/Editorial/Publications/Documents/The-Smartphone-Royalty-Stack-Armstrong-Mueller-Syrett.pdf. Last accessed on February 3, 2017.

**3.** **Reasonable and Non-Discriminatory Terms ("FRAND") Prevent Patent Abuse by SEP Holders.**

51.     In an effort to alleviate the aforementioned potential concerns, SSOs request certain assurances from patent owners prior to adopting a particular standard. These obligations are known in the industry as fair, reasonable, and non-discriminatory terms ("**FRAND**"). Specifically, SSOs require SEP holders to license their patents on FRAND terms. For example, the IEEE would ask SEP owners to pledge that they will grant licenses to an unrestricted number of applicants on reasonable and nondiscriminatory terms – and if a patent holder chooses not to agree, the SSOs would design a standard that foregoes utilizing that holder's patented technology.

52.     One of the purposes of FRAND obligations is to prevent SEP holders from wielding complete control over essential technology – and thereby restricting competition or research and development related to the standard. Typically, SEP holders will agree to FRAND terms because SSOs may exclude their technologies from the standard if they refuse to agree to FRAND terms.  SEP holders also benefit from cooperating with the SSO in the form of license fees and royalties that they gain as a result of having their technologies implemented in the standard.

53.     When a SEP holder makes a FRAND promise to an SSO, implementers of the standard and their customers are beneficiaries of that promise. Therefore, FRAND commitments are more than a matter of a private contract but rather, ***FRAND obligations are a critical precondition for any antitrust tolerance of the industry collaboration on which standard-setting – and by extension, properly functioning wireless technology throughout the world – depends.***

54.     As the United States Court of Appeals for the Third Circuit aptly summarized in a suit against Qualcomm:

> [A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. ***Firms may become locked in to a standard requiring the use of a competitor's patented technology.*** The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations

omitted) (emphasis added).

**B.    Defendant Qualcomm's Dominance and Abuse of Power in the Cellular Industry.**

**1.    Brief History of the Development of the Wireless Industry**

55.    Mobile technology and wireless standards have evolved in distinct generations, as consumers continually sought more advanced features and the industry responded by developing new, innovative technology.  Modern day mobile technology is indeed, in Qualcomm's words, "an amazing technical achievement."[11]



**Image 13:** Qualcomm's graphic lists just some of the features demanded by consumers and delivered by technological giants such as Qualcomm.
*Source*: Qualcomm's June 2014 PowerPoint Presentation: "The Evolution of Mobile Technologies."

56.    For purposes of this case, following the first generation of cellular technology ("**1G**"), the cellular industry developed second generation ("**2G**") cellular technology, from which two primary technology paths (or families of standards) emerged:

(a)  "**CDMA**," which stands for "Code Division Multiple Access"; and

(b)  "**GSM**," which stands for "global system for mobility."

57.    CDMA is a channel access method used by various radio communication technologies that provides multiple access, where several transmitters can send information simultaneously over a

---

[11] *See* Qualcomm's June 2014 PowerPoint Presentation: "The Evolution of Mobile Technologies."

single communication channel. CDMA is used as the access method in many mobile phone standards, and it is most popular in the United States and Russia.

58.     <u>GSM</u> is another digital mobile telephony system[12] that is widely used in Europe and much of Asia (other than Japan and South Korea). Short for "Global System for Mobile communication," it digitizes and compresses data, and then sends it down a channel with two other streams of user data, each in its own time slot.

59.     Cellular telephone service providers operate under one path or the other, with, for example, Verizon and Sprint operating CDMA-path networks, and AT&T (formerly Cingular) and T-Mobile operating GSM-path networks.

60.     The CDMA and GSM technology paths are two different ways to accomplish the same goal, but are not interoperable. In other words, equipment and technologies designed to be compatible with one standard cannot be used for the other standard. Mobile devices are configured for a particular carrier (like AT&T or Verizon) and therefore, chipsets programmed for a particular wireless device must comply with the standard technology chosen for the carrier's associated network. Accordingly, CDMA-based networks demand chipsets that conform to the CDMA standard, and GSM networks require chipsets that conform to the GSM standard.



**Image 14:** GSM and CDMA are two dominant technologies for mobile communication – and CDMA is almost exclusively used in the United States and some parts of Canada and Japan.
*Source*: http://www.engineersgarage.com/contribution/difference-between-gsm-and-cdma

---

[12] "Mobile telephony system" describes a system where phones may move around freely rather than stay fixed in one location by connecting to a terrestrial cellular network of base stations (whereas satellite phones connect to orbiting satellites).

61.     As a result, chipsets that comply with a certain standard are not substitutes for chipsets that comply with other standards.  These chipsets likewise have different price and demand characteristics.  Downstream consumers purchase cell phones that include chipsets designed to operate using standards chosen for a particular network and not another – and once purchased, those consumers are inextricably tied to that standard for use of that device.

> **2.    Qualcomm's Powerful Patent Portfolio in Mobile CDMA and LTE Technologies.**

62.     Defendant Qualcomm pioneered the development of the ground-breaking CDMA technology, which the International Telecommunication Union adopted as the primary technology for Third Generation ("**3G**") wireless systems in 1999. From then on, ***Qualcomm controlled, and continues to control, the market for such technology, initially selling 90% of the chipsets that go into CDMA-compatible phones and continuing to control over 80% of the market.***[13]



**Image 15:** Qualcomm's dominance in the cellular communication industry.
*Source*: KFTC Report p. 3.

63.     Virtually all wireless companies have signed patent licenses with Qualcomm, and the CDMA technology accounts for one of the most profitable and lucrative portions of Qualcomm's patent portfolio. Additionally, Qualcomm has collected numerous patents related to this standard. ***As a result, nearly any company that manufacturers CDMA products***—be they chipsets, phones, or infrastructure gear—***must obtain a license from Qualcomm***.  Licensees pay a one-time fee to access Qualcomm's patent portfolio, and then pay royalties calculated on the final product sold by the licensee (*e.g.*, a tablet).

---

[13] *See* KFTC Report at p. 3.

64.    Qualcomm's technology continued to be standardized from first generation ("**1G**", to second generation ("**2G**"), to third generation ("**3G**") cellular technology.  As with the prior generation of cellular technology, 3G developed into two competing standards. This time, however, ***both*** major standards were based on CDMA.  While an improved version of CDMA technology was developed, the "Universal Mobile Telecommunications Service" ("**UMTS**") standard was also developed. UTMS uses radio technology called "Wideband Code Division Multiple Access ("**WCDMA**").

65.    After evaluating various alternative technologies available, numerous SSOs in the United States and the world – including the ITU, ETSI, and IEEE – adopted the UMTS standard. Defendant Qualcomm is the supplier of some of the essential technology that the ETSI included in the UMTS standard and additionally, holds intellectual property rights ("**IPRs**") including patents in the technology.

66.    Furthermore, CDMA-based technology has been adopted for ***all*** 3G wireless telephony and broadband standards throughout the world.  Consequently, Qualcomm has reaped more than $50 billion in licensing revenues since 2000 – charging a royalty on nearly every smartphone made, regardless of whether the device uses its chipsets.

67.    Fourth Generation wireless systems came next ("**4G**" or "**LTE**," which stands for long term evolution), with Qualcomm once again leading the pack. Qualcomm boasts their LTE technology to offer "unprecedented data rates, higher capacity, and new levels of user experience." The spread of LTE technology has only bolstered Qualcomm's position in the market because Qualcomm still exclusively supplies multimode CDMA-LTE chipsets that are backwards-compatible[14] with CDMA. It is estimated that "[b]y 2019, 65% of the world's population is forecasted to have LTE coverage."[15]

68.    Lastly, proving to be ahead of the game again, Qualcomm is already beginning to create the foundation for the fifth generation wireless system ("**5G**"). States CEO Steve Mollenkopf: "While

---

[14] Evolution of cellular communication does not simultaneously change communication standards at once because there are still users of handsets using the old standard and it takes substantial time to replace base stations. Therefore, modem chipsets and handsets have to support not only new standards, but the old standards as well.

[15] *See* Qualcomm's website at https://www.qualcomm.com/invention/technologies/lte. Last accessed on February 7, 2017.

others have been talking about 5G, we have been creating it."[16] Even more than ever before, users throughout the nation and the world will be reliant upon Qualcomm's cutting-edge technology.



**Image 16:** Qualcomm has begun building the foundation for the 5G network.
*Source*: https://www.qualcomm.com/invention/5g

### 3.    Qualcomm's Violation of Its FRAND Promises.

69.    As previously discussed, SSOs require a commitment from vendors whose technologies are included in the CDMA and other CDMA-based standards to license their technologies on FRAND terms.

70.    In order to have their technology utilized in these standards, Qualcomm voluntarily and publically agreed to accept FRAND obligations, emphasizing that it has "had a long standing policy of broadly offering to license its standards essential patents for CDMA-based telecommunications standards on terms and conditions that are fair, reasonable, and free from unfair discrimination (FRAND), subject to reciprocity."[17]

71.    In the same press release, Qualcomm assured the public with the following interpretation of its FRAND commitments: "FRAND embodies a flexible approach that allows individual licensors and licensees to negotiate the terms and conditions that are best suited to address

---

[16] *See* Qualcomm's website at https://www.qualcomm.com/invention/5g. Last accessed on February 7, 2017.

[17] *See* Qualcomm's LTE-WiMax Patent Licensing Statement at http://techipminnovationfrontline.blogspot.com/2009/05/lte-patent-licensing-contenders.html. Last accessed on February 7, 2017.

their respective commercial objectives." Also, "FRAND does not, and never has, prescribed formulas for imposing cumulative royalty caps or proportional allocations of such royalty caps."[18]

72.    Both of these public statements by Qualcomm, however, were false. As numerous regulatory actions in countries around the world have confirmed[19], **Qualcomm has not kept its FRAND obligations, and its reading of FRAND is not consistent with the actual obligations imposed on it by SSOs.** This is particularly significant because at the time of this press release in 2008, Qualcomm had licensed its patent portfolios to more than 155 companies – **making their portfolio the most widely licensed in the industry.**

73.    Qualcomm's promises to comply with its FRAND obligations induced the SSOs to utilize its technology in the cellular technology standards relevant to this action. These promises constituted deceit and fraud on the SSOs and has consequently injured Plaintiffs and others that have had to pay artificially high prices for cellular devices as a result of Qualcomm's unreasonable royalty demands.

74.    Indeed, Qualcomm has unlawfully abused its power over SEPs and the chipset supply to increase its own dominance in these markets and to charge outrageous royalties.  In short, it has manipulated its involvement in the SSOs – the very organizations that set standards around Qualcomm's technology and gave Qualcomm the means to become as powerful as it has. Qualcomm's abuse of its unique position is confirmed by the conclusions of multiple investigations of its conduct by trade and competition agencies around the world, as discussed above, *supra*, in section V(C).

75.    Separately, as mentioned above, the 4G realm of cellular technology brought with it the "LTE" standard. Nearly all cellular-enabled devices sold today support LTE for 4G service.  LTE is an "orthogonal frequency division multiple access" ("**OFDMA**") based technology that does not implement CDMA-based technologies.

76.    The introduction of the LTE standard has not substantially affected Qualcomm's dominance over the modem chipset market or the power of its licensing business. Qualcomm

---

[18] *Id.*

[19] *See* Complaint at Section V(C), *supra.*

continues to maintain a robust patent portfolio that applies to LTE technologies, including OFDMA. Over 90 companies (including LG, Nokia, and Samsung) have royalty-bearing licenses under Qualcomm's patent portfolio for use in OFDMA products, and many of the 4G-based cellular devices still rely on CDMA technology to be backwards-compatible with CDMA-based technologies that are still in use today.  In fact, Qualcomm exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.[20]

77.    Consequently, with its power over CMDA technology, Qualcomm can and does use this as leverage to gain a greater share of the LTE-chipset market. The impact of this is not to be taken lightly. As the following chart prepared by the KFTC depicts, Qualcomm has continually wielded control over CDMA- based technologies to acquire more power and control over the LTE chipset market. In addition, Qualcomm holds an unrivaled share for high-end premium products.[21]

**<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)>**

|        | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE    | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA   | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA  | 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

\* Source: Strategy Analytics

**Image 17:** Qualcomm's continued dominance in the modem chipset market per standard.
*Source:* KFTC Report at p. 4.

78.    In sum, Qualcomm holds a dominant position in the supply of chipsets that support CDMA, on which devices sold by multiple manufacturers continue to depend.  It also holds a dominant position over the LTE-chipset supply. As seen in the chart below, ***Qualcomm has had at least a share of 80% or more of CDMA chipsets for many years, and Qualcomm's share of LTE chipsets sold was above 90% between 2012 and 2014, and remains nearly 70% percent today.[22]***

79.    Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements. In other words, because these companies need CDMA- and LTE-based chipsets (which are controlled by Qualcomm) to be able to

---

[20] *See* KTFC Report at p. 3.

[21] *See* KFTC Report at p. 4.

[22] *See* KFTC Report at p. 4.

operate with CDMA- and LTE-based networks, device manufacturers have no other choice but to accept unreasonable license terms as unilaterally controlled and dictated by Qualcomm.

80.    Qualcomm even implemented a business policy to supply modem chipsets to handset companies that are not licensed by Qualcomm. Qualcomm coerces patent license agreements with handset companies while holding hostage the supply of chipsets – effectively increasing their profit margins and gaining more market share.

81.    As Columbia Business School professor Richard A. Taddonio remarked: "Qualcomm's status as both a chipset and IP vendor provides them with unparalleled leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid. This allows their licensing segment to operate at much higher margins…".[23]

### 4.    Qualcomm's Dominance in the Market and Anticompetitive Licensing Practices Inflate the Patent Royalties That It Collects Above Competitive Rates.

### a. Qualcomm Controls The Licensing Market For Numerous Technologies.

82.    Qualcomm also holds a dominant position in the SEP licensing market for its intellectual property relating to modem chipsets. Having declared thousands of patents as essential to numerous standards, Qualcomm has captured the reliance of OEMs for which these SEPs are indispensable components. Essentially, Qualcomm controls the licensing market for SEPs for CDMA, UMTS (WCDMA), and LTE technologies because manufacturers could not produce 3G and 4G devices without Qualcomm's SEPs.

83.    Qualcomm then uses its SEPs to require OEMs and others to license its entire patent portfolio, which includes non-SEPs as well. Non-SEPs are patents that are either not essential to a standard or otherwise replaceable in their functionalities through design-around or avoidance design. Unlike SEPs, there is no requirement that non-SEPs be licensed on FRAND terms.

84.    By putting both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis. In doing so, ***Qualcomm can charge excessive and unfairly***

---

[23] *See* Richard A. Taddonio's "Chips on the Table" investment thesis at https://www8.gsb.columbia.edu/valueinvesting/sites/valueinvesting/files/Taddonio_Richard-QCOM_0.pdf. Last accessed on February 7, 2017.

*high royalties to any licensees that were forced to accept the packaged patent licenses.* This unchecked conduct has resulted in massive profits. Indeed, Qualcomm's licensing division brings in the vast majority of its profits, as illustrated in the graph below.



**Qualcomm's Licensing Profit Takes Off**
Chipmaker's profits increasingly depend on patent income

■ Licensing Profit    ■ Chip Unit Profit

Source: Bloomberg data

Bloomberg

**Image 18:** In the last five fiscal years, Qualcomm has turned $37 billion of licensing revenue into $32 billion of pretax profit. Its gross margin, or the percentage of revenue remaining after deducting the cost of production, is 61% and is predicted by analysts to widen. Contrast that with Apple's gross margin of 39% in its most recent fiscal year (a number that is predicted to narrow in 2017) and Samsung, the biggest maker of mobile phones ahead of Apple, also had a margin of 39% in its most recent fiscal year. *Source:* https://www.bloomberg.com/news/articles/2017-01-23/apple-s-legal-assault-on-qualcomm-is-part-of-phone-margin-grab

> **b.    Qualcomm's Business Structure is Designed to Maintain and Further Entrench Its Unlawful Licensing Power.**

85.    Qualcomm has divided its business structure into two separate corporate entities – QCT (its modem chipset business) and QTL (its license business). By structuring their business model in this manner, Qualcomm is able to maintain its dominant licensing power in the modem chipset market.

86.    In short, the KFTC summarized three abusive and anticompetitive practices by Qualcomm:

> (a)    QTL does not provide SEP licenses to competing chipset companies while simultaneously threatening to sue them under those patents if they compete against Qualcomm in the sale of chipsets.

(b) While selling baseband processors to handset companies, QCT demands the execution and performance of its license agreements with QTL, thus leveraging its SEPs improperly because their businesses are inextricably linked.

(c) As a result, QTL can and did easily coerce handset manufacturers to accept unilateral onerous terms, and enables Qualcomm to obtain cross-licenses on handset companies' patents.

87.    The KFTC depicted this conduct in the graphic below:



**Image 19:** KFTC's overview of Qualcomm's business structure.
*Source*: Page 5 of the KFTC's Report

88.    In 2007, Qualcomm claimed publicly that any manufacturers using CDMA and UMTS/WCDMA technology "ha[s] to take out a license from Qualcomm"[24] and that Qualcomm had been "pretty consistent in that model."[25] Even where Qualcomm sells its own chips, it requires purchasers to agree to its license agreements – which include the royalty rate based on the entire selling price of the device.

89.    Qualcomm's policy of not licensing SEPs to competing chipset makers while insisting on licensing from cellular device manufacturers has entrenched its market power.

---

[24] Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

[25] *Id.*

90.     Additionally, since OEMs cannot purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, OEMs and other mobile device suppliers will sometimes agree to deal exclusively or near-exclusively with Qualcomm on the purchase of chipsets simply to avoid such royalties.

91.     For example, as the FTC explained in its complaint[26], Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties since 2007. Qualcomm's agreements with Apple provided for billions of dollars in conditional rebates from Qualcomm to Apple for baseband processor sales from 2011 to 2016 that effectively penalized Apple's use of any baseband processors supplied by Qualcomm's competitors. Likewise, Samsung has also entered into a similar exclusive dealing arrangement with Qualcomm.

92.     Qualcomm's exclusive supply arrangement with these OEMs denies other baseband processor suppliers the benefits of working with important cell phone manufacturers and impedes their ability to develop into effective competitors.

93.     Indeed, the KFTC notes that although the size of the modem chipset market has doubled since 2008, no significant competitor has entered the market due to Qualcomm's refusal to license and other unlawful practices – and in fact, to the contrary, many existing competitors were forced to exit it.



| Modem Chipset Maker | Exit (Imminent) Time |
|---|---|
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

**Image 20:** KFTC's illustration of the market growth trend in the modem chipset market and market exit by major chipset companies.
*Source*: Page 11 of the KFTC's Report

---

[26] *See* FTC Complaint at 24:1 – 25:8.

94.    As a result, Qualcomm's market share and market concentration in the modem chipset market has steadily increased.

95.    This dominance in the chipset market, coupled with its ownership of critical SEPs built into several of the standards adopted by various SSOs, allowed Qualcomm to impose onerous license terms on cellular device manufacturers, including exorbitant royalties to the contrary of the FRAND process in place.



**Image 21:** KFTC's illustration of the changes of market shares in the worldwide modem chipset market from 2008 to 2015.
*Source*: Page 10-11 of the KFTC's Report

### c.    Qualcomm's Royalty Rates Are Significantly Higher Than Others In the Industry.

96.    Qualcomm's royalty rates of 5% for most CDMA products and 3.25% for more recent LTE-based products are significantly higher than others in the industry, as illustrated in the below chart. Not only does Defendant Qualcomm clearly hold the highest number of declared essential patents, its royalty rate easily doubles a number of their competitors' rates.

| Company | Published Royalty Rate (%) | # of Declared Essential Patents |
|---|---|---|
| Alcatel-Lucent | 2.00 | 9 |
| Ericsson | 1.50 | 146 |
| Huawei | 1.50 | 182 |
| Motorola | 2.25 | 16 |
| Nokia Corporation | 1.50 | 142 |
| Nokia Siemens Networks | 0.80 | 32 |
| Nortel Networks | 1.00 | 46 |
| Qualcomm | 3.25 | 350 |
| ZTE | 1.00 | - |

*Source:* Stasik, Eric: "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," September 2016 at pg. 116.

97.    Qualcomm's basis for which it calculates its rates also contributes to the manipulative nature of its royalties. Rather than basing its royalty rates on its contributing technology alone, Qualcomm bases its rates on the entire value of the end product sold.

98.    Indeed, Qualcomm admits that its "[r]oyalties are generally based upon a ***percentage of the wholesale (i.e., licensee's) selling price of complete licensed products***, net of certain permissible deductions (including transportation, insurance, packing costs and other items) (emphasis added)."[27]

99.    ***Using the full value of an end-product is not a reasonable basis for calculating SEP-based royalties.***  For example, IEEE and its Standards Association states that a reasonable royalty should be the value attributable to a SEP. In other words, it should be based, among other things, on the value that the patented technology contributes to the "smallest salable component of the overall product."[28]

100.    Qualcomm's power and leverage in the modem chipset market allows it to force licensees to pay inflated rates on an unreasonable rate basis, which results in an increased royalty payment divorced from the actual value attributable to Defendants' technologies and intellectual property – to the harm of all end-users of mobile devices across the board.

[27] *See* Qualcomm's Form 10-K for the fiscal year ending September 28, 2014 at page 7.

[28] *See* "IEEE Amends its Patent (FRAND) Policy" by Dennis Crouch, PatentlyO (February 9, 2015) at http://patentlyo.com/patent/2015/02/amends-patent-policy.html. Last accessed on February 6, 2017.

C.     **Worldwide Regulatory Action Against Defendant Qualcomm's Widespread Unlawful Royalty Calculations and Licensing Practices.**

101.     Qualcomm's manipulation of the modem chipset market has given it billions of dollars in ill-gained profits – but its practices have been scrutinized and condemned by lawmakers and regulatory agencies throughout the world. Just in the last few years, ***Qualcomm's royalty fees and unscrupulous licensing practices have been investigated and denounced by competition regulators in China, South Korea, Taiwan, Japan, Europe, and the United States.***

102.     As described in more detail below, these foreign regulatory agencies have harshly concluded – or are about to conclude – that Qualcomm's conduct as alleged herein in this complaint is monopolistic, unfair, and injurious to consumers.

1.     **China**



103.     On November 23, 2013, China's National Development and Reform Commission ("**NDRC**") commenced an anti-monopoly investigation of Qualcomm's SEP licensing practices.[16]

104.     On February 9, 2015, Chinese authorities found that Qualcomm

(a) controlled the SEP Licensing Market and the CDMA, WCDMA, and LTE baseband chip markets, and

(b) abused that dominance by, among other things, charging excessive and unfairly high royalties to any licensees that were "forced" to accept the packaged patent licenses – the  royalty rates of which were unreasonably based on the wholesale net selling prices of smart phones.

105.     ***Additionally, the NDRC found Qualcomm's conduct violated provisions of the China Anti-Monopoly Law and, among other things, imposed a record-breaking fine of 8%   of Qualcomm's annual revenue within the territory of China for 2013—a $975 million fine.***

106.     The NDRC also ordered Qualcomm to reduce its royalty calculation by basing it off of the 65% of the wholesale price of the device rather than 100%.

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

### 2. Korea



**Fair Trade Commission**

107.    In July of 2009, the Korea Fair Trade Commission ("**KFTC**") fined Defendant Qualcomm *US$208 million* for abusing its dominant share of the chipset market and the SEP license market, and ordered the company to end its unfair licensing practices with respect to the same.

108.    *Although the $208 million fine was the largest the KFTC had then ever imposed on a company, Qualcomm was undeterred and instead, doubled down on its unlawful conduct* – which would result in another fine that replaced the $208 million fine as the largest ever levied in Korea.

109.    *In December 2016, after a three-year investigation, the KFTC issued a decision imposing a fine of US$854 million against Defendant Qualcomm in its largest fine ever levied* for Qualcomm's breach of antitrust law by limiting competing chip markers' access to its patents, and for coercing mobile-phone manufacturers into unfair license agreements by refusing to supply crucial phone chips to those that disagreed with its terms.

110.    Indeed, among other things, the KFTC found that Qualcomm used its market position as a leveraging tool in forcing patent license agreements from handset companies during licensing negotiations – while holding hostage their supply of chipsets.  KFTC's report noted that Qualcomm prescribed that Qualcomm can, at any time, refuse or stop the supply of chipsets when a handset company does not execute or perform a license agreement. Qualcomm actually used the threat of terminating the supply of modem chipsets as negotiation leverage in the process of license negotiations with handset companies."[29]

111.    The KFTC concluded that Qualcomm's control over the chipset market "is a structure under which handset companies have to bite the bullet and accept Qualcomm's license terms, even if they are unfair, because if the modem chipset supply is suspended, handset companies would face the

---

[29] *See* KFTC's Report at pg. 6.

risk of their entire business shutting down."[30] This renders Qualcomm's FRAND commitment meaningless.

### 3. Taiwan



112.    In December 2015, the Taiwan Fair Trade Commission ("**TFTC**") notified Qualcomm of its investigation into whether the company's licensing behavior violate the Taiwan Fair Trade Act and, among other things, whether Qualcomm's royalty charges are unreasonable.

### 4. United States



113.    Most recently,  on January 17, 2017, the FTC filed an enforcement action in this Court seeking a permanent injunction against Defendant Qualcomm to undo and prevent its unfair methods of competition in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) ("**FTC Complaint**").

114.    The FTC alleges, among other things, that

(a) Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties that the customer must pay when using competitors' processors (known as "no license, no chips");

(b) Qualcomm has continually refused to license its SEPs to its competitors, in direct violation of Qualcomm's FRAND commitments; and

(c) Qualcomm entered into exclusive dealing arrangements with companies such as Apple Inc., which denied other baseband processor suppliers the benefits of

---

[30] *See* KFTC's Report at pg. 11: "As Qualcomm coerces the execution and performance of patent license agreements by using modem chipset supply as a weapon, FRAND commitment that restrains abuse of dominance in the SEP license market is in effect debilitated.

working with a significant cell phone manufacturer and hampered their development into effective competitors.[31]

**D.     Defendant Qualcomm's Unlawful Monopolistic Conduct Caused Widespread Injury to Plaintiff and the Classes.**

115.    Amongst other things, Qualcomm has abused its monopoly power to force device manufacturers and other licensees to pay excessively high royalties, which has directly resulted in harm to Plaintiffs and the Class. Qualcomm's unlawful, monopolistic conduct resulted in hundreds of millions of unsuspecting members of the Classes paying higher prices for their Cellular Devices than they would have in the absence of Qualcomm's conduct in a free market.

116.    Cellular Devices are commodity products that consumers purchase as standalone products.  Consumers buy Cellular Devices either from the device manufacturers such as Samsung, Apple, Amazon, and General Motors or through their network carrier, such as Verizon or Sprint.

117.    Since device manufacturers and network carriers are subject to vigorous price competition, they do not absorb Qualcomm's exorbitant royalties which are unlawfully based on a percentage of the wholesale cost of the device itself. Rather, device manufacturers and network carriers pass along these excessive royalty overcharges to consumers.

118.    For example, while modem chipsets cost as little as $10 to $13, royalty fees associated with the component can approach $60 for a $400 smartphone.[22]  This disparity between royalty demands and actual component costs results in an increased cost for the Cellular Device as a whole, which is directly passed on to the consumer.

119.    Ultimately, Qualcomm and Plaintiffs are all participants in the Cellular Device market. Plaintiffs are consumers of such devices.  Qualcomm licenses technology essential to the operation of Cellular Devices and obtains monopoly rents tied directly to the entire wholesale price of the Cellular Devices at issue in this litigation. As a result, Qualcomm's anticompetitive acts, as alleged herein, directly distorted and increased the price of the Cellular Devices paid by Plaintiffs. Indeed, Plaintiffs are unable to use the Cellular Devices at issue in this litigation without the licenses provided by

---

[31] *See* FTC Complaint at 2:18 – 3:4.

Qualcomm. In the absence of the licenses, as recognized by federal courts, Qualcomm has standing to sue any indirect users—not just direct infringers—of Cellular Devices infringing on its patent rights.

120. As noted above, Qualcomm admits that "[r]oyalties are generally based upon a **percentage of the wholesale (i.e., licensee's) selling price of complete licensed products**, net of certain permissible deductions (including transportation, insurance, packing costs and other items)" (emphases added).[23] The patent rights owned by Qualcomm are thus inextricably intertwined with the cellular devices themselves—and the effect of the anticompetitive conduct at issue in this case is targeted at the Cellular Device as a whole and not components thereof, as reflected by the royalty's derivation from the price of the Cellular Device as a whole.

121. As a result of Defendant's unlawful behavior, Plaintiffs and members of the Class have been forced to pay supra-competitive prices for Cellular Devices. As Professor Jeffrey K. MacKie-Mason notes:

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers… This general phenomenon of cost pass through is well-established in antitrust laws and economics as well.[32]

122. Had Qualcomm not engaged in its unlawful, monopolistic conduct and instead charged a fair and reasonable royalty per their FRAND obligations, consumers throughout the world would have paid less for their Cellular Devices.

## VI.    ANTITRUST INJURY

123. Defendant's price-fixing conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to Cellular Devices;
(b) The prices of Cellular Devices have been raised to artificially inflated levels;
(c) Purchasers of Cellular Devices have been deprived of free and open competition; and
(d) Purchasers of Cellular Devices, including Plaintiffs, paid artificially inflated prices.

---

[32] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases,* No. J.C.C.P. No. 4106 (Cal. Sup. Ct. Aug. 29, 2000).

124.     During the respective Class Periods, Plaintiffs and the Classes paid supra-competitive prices for Cellular Devices.

125.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for Cellular Devices than they would have paid in the absence of Defendant's illegal contract, combination, or conspiracy, and as a result have suffered damages. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    MARKET DEFINITION

126.     The relevant geographic market for purposes for this action is the United States and its territories.

127.     The relevant product markets are (1) the market for CDMA and premium LTE modem chipsets (the "**Modem Chipset Market**") and (2) intellectual property rights associated with SEPs (the "**SEP Licensing Market**"). These two product markets are referred to collectively herein as the "**Cellular Device Components**."

128.     Qualcomm encumbers Cellular Devices through its licenses and related royalties (calculated as a percentage of the wholesale price of Cellular Devices), thereby directly participating in the market for the sale of Cellular Devices to Plaintiffs and Class Members.

129.     When Plaintiffs buy a Cellular Device, they also purchase the Cellular Device Components. Qualcomm's anticompetitive conduct causes Plaintiffs' injuries because it has (1) eliminated competition and therefore been able to charge supracompetitive prices for Cellular Device Components and (2) forced OEMs to agree to licensing terms which included excessive royalties. This conduct causes Plaintiffs to pay more than they should for Cellular Devices.

## VIII.    CLASS ACTION ALLEGATIONS

130.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking damages, equitable and injunctive relief on behalf of the following class (the "**Nationwide Class**"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-and/or premium LTE cellular devices ("**Relevant Cellular Devices**") for

their own use and not for resale from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities; and (c) any judges or justices involved in this action and any members of their immediate families or their staff.

131. Alternatively to the claim for nationwide monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief pursuant to individual state antitrust, unfair competition, and consumer protection laws for each of the states listed below (the "**Indirect Purchaser States**") on behalf of the following class (the "**Damages Class**"):

All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA- and/or premium LTE cellular devices ("**Relevant Cellular Devices**") from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

132. The Nationwide Class and the Damages Class are referred to herein as the "**Classes**."

133. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of members in each Class.

134. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Qualcomm's conduct to acquire and maintain monopoly power, which was and is generally applicable to all the members of both Classes – thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include (but are not limited to):

(a) Whether Qualcomm possessed monopoly power over the Cellular Device Components in the United States during the Class Period;

(b) Whether Qualcomm willfully acquired or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

(c) Whether Qualcomm possessed monopoly power in the Modem Chipset Market (underlying the Cellular Device Components) in the United States during the Class Period;

(d) Whether Qualcomm attempted to possess monopoly power in the modem chipset market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

(e) Whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

(f) Whether Qualcomm attempted to possess monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

(g) Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

(h) Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

(i) Whether Qualcomm's acquisition and maintenance of its monopoly in the Cellular Device Components violated the Sherman Act, as alleged in the First Claim for Relief;

(j) Whether Qualcomm's acquisition and maintenance of its monopoly in the power in the Modem Chipset Market violated the Sherman Act, as alleged in the First Claim for Relief;

(k) Whether Qualcomm's acquisition and maintenance of its monopoly in the SEP Licensing Market (for licenses critical to the technology underlying cellular device market) violated the Sherman Act, as alleged in the First Claim for Relief;

(l) Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, as alleged in the Second Claim for Relief;

(m) Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Claims;

(n) Whether Qualcomm unjustly enriched itself to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fifth Claim for Relief;

(o) Whether the conduct of Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(p) The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

(q) The appropriate damages, injunctive and related equitable relief for the Nationwide Class; and

(r) The appropriate class-wide measure of damages for the Damages Class.

135.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for purchases of Cellular Devices.

136.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

137.    The questions of law and fact common to the members of the classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

138.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and

without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

139.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant.

## IX.    CLAIMS AND PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

140.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

141.    Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

142.    As discussed above, Qualcomm maintains monopoly power in the modem chipset market, which refers to its ability to control prices and exclude competition. In other words, Qualcomm can profitably raise prices for their component parts without causing competitors to expand output and reduce prices. The company has historically held high and durable market shares in the market, continuously controlling over 90% of the CDMA modem chipset market. Even at its lowest point, Qualcomm controlled 83% of the market.

143.    Qualcomm also controls the modem chipset market as a whole, maintaining up to 90% of the market and nearly 70% today (see KTFC's chart, *supra,* at ¶ 76). Additionally, Qualcomm is the exclusive supplier of multimode CDMA-LTE chipsets that are backwards-compatible with the CDMA standard.

144.    There are also significant barriers to entry because, as previously discussed, CDMA- and premium LTE- based technology is not interchangeable with or substitutable for other technologies – causing users of that technology to become locked-in to a certain standard. and

adherents of this technology have become locked-in. Since Qualcomm controls the SEPs underlying CDMA technology and the market as a whole, Qualcomm can and has refused to license to competitors and required purchasers of its chipsets to agree to its patent portfolio licenses. Qualcomm's unilateral terms are unreasonable and unlawfully violate its FRAND commitments and these actions, coupled with its control over the chipset market, lead to excessively high royalty terms at the consumers' cost.

145.    Qualcomm also holds a monopoly in the SEP Licensing Market. SSOs have chosen and implemented standards based on technology for which Qualcomm owns the patents, based on the condition that Qualcomm would supply its technology consistent with FRAND. Qualcomm holds virtually all of the SEPs for CDMA standard-based technologies, which are used for nearly all 3G devices and 4G-LTE devices which are 3G-compatible. Since these patents are – as its name reveals – essential to the CDMA standard, other patents and patented technology cannot be substituted for Qualcomm's patents, making Qualcomm's chipsets critical for operability. Having this market power over the SEP licensing market enables Qualcomm to leverage its control of its patents and force OEMs to agree to unfair and unreasonable license agreements and terms. These include excessive royalties. Since OEMs must use Qualcomm's technology for their devices to communicate with the major carrier networks, they have no other choice but to agree to Qualcomm's unfair and unreasonable licensing terms.

146.    As indicated, Qualcomm has acquired and maintained its market power in the Cellular Device Components described above through anticompetitive means—among other things, excluding competitors and forcing OEMs to agree to non-FRAND terms.

147.    Qualcomm's robust market power over cellular device components reinforces itself because it can encumber relevant cellular devices with a royalty of its choice without the interference of other competing firms in driving down prices as they would in a free market. Qualcomm's control over the cellular device components has allowed it to force license agreements on its competitors and OEMs, and its license agreements allow Qualcomm to charge a licensing fee plus ongoing royalties of between three to five percent (3-5%) of the wholesale price of the entire completed device. In other words, each relevant cellular device sold with or based on Qualcomm technology is also burdened by

Qualcomm's exorbitant royalties – which in turn increases the cost of the device for consumers like Plaintiffs.

148.    There is no procompetitive justification for the Qualcomm's anticompetitive conduct. Qualcomm persuaded SSOs to use its technology and related patents in setting their standards under the guise that it would adhere to FRAND obligations. By manipulating their technology into standards chosen by SSOs, other alternative – and potentially superior – technologies were passed by SSOs. As alleged herein, Qualcomm has violated its FRAND obligations and manipulated its monopoly power with respect to cellular device components, forcing OEMs into licensing agreements with unfair and unreasonable terms. These terms include the excessively high royalty rates based on the selling price of the entire completed device rather than just the value of Qualcomm's technology contributing to the price. In doing so, other alternative (and potentially superior) technologies were not utilized by SSOs.  Qualcomm's acts have likely hindered the development of cellular technologies because it forced out competitors, innovation, and the possibility of competitive pricing.

149.    In sum, Plaintiffs and the class were harmed as a direct result of Qualcomm's conduct because it increased the purchase price of their relevant cellular devices. Additionally, Qualcomm's conduct harmed innovation and competition, which in turn harmed Plaintiffs in the quality and price of their relevant cellular devices.

### SECOND CLAIM FOR RELIEF
**Violations of the Cartwright Act,**
**Cal. Bus. & Prof. Code §§ 16700, *et. seq.***

150.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

151.    During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq.* Section 16700 does not reach solely unilateral conduct by a monopolist, but rather encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. As alleged in the complaint herein, that is precisely what occurred with respect to Qualcomm – despite its FRAND obligations, Qualcomm unilaterally

imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

152.    Qualcomm established and carried out an unlawful scheme by which it acquired and maintained monopoly power in the modem chipset market and SEP licensing market through anticompetitive means, including by excluding competition.

153.    The relevant cellular devices at issue are commodities.

154.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

155.    It is appropriate to apply California antitrust law to the Nationwide Class because Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as OEMs that reside and do business in California to its unlawful conduct.  In doing so, Qualcomm obtained a significant portion of its ill-gained profits from companies doing business in California. Additionally, California is the most populous state in the country, for which it was foreseeable that substantial number of California consumers would be impacted by Qualcomm's unlawful behavior.

### THIRD CLAIM FOR RELIEF
**Violations of Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, et seq.**

156.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

157.    Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which protects consumers from illegal, fraudulent and unfair business practices.

158.    Plaintiffs bring this claim on behalf of themselves, the Damages Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204. As discussed above, Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act.  As such, Qualcomm's acts constitute unlawful conduct under § 17200.

159.    Through anticompetitive conduct, Qualcomm unlawfully acquired and maintained its monopoly over the Modem Chipset Market and SEP Licensing Market. Amongst other things, Qualcomm excluded competitors by refusing to license its technology to them, engaging in exclusive

dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its entire patent portfolio for access to standard technology. Qualcomm's conduct was deceptive because it induced SSOs to use its technology under the guise that it would comply with its FRAND obligations. However, after SSOs chose Qualcomm's technology to be implemented for their standards, Qualcomm reneged on its FRAND promises.

160.    Qualcomm's conduct is unfair to Plaintiffs and members of the class because as a direct result of its acts described above, Plaintiffs were charged more for their Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

161.    Plaintiffs and the class seek and are entitled to all forms of relief available under California's Unfair Competition Law. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Damages Class seek from Qualcomm restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Business & Professions Code § 17200 *et seq.*

162.    It is appropriate to apply California antitrust law to the Nationwide Class for multiple reasons. First, Qualcomm is headquartered in California, and Qualcomm subjected its competitors (as well as handset companies) that reside in California to its unlawful conduct. By doing so, Qualcomm reaped a significant portion of its ill-gained profits from companies doing business in California. Second, California is the most populous state in the country – making it foreseeable to Qualcomm that a significant number of California consumers would be negatively impacted by their unlawful behavior.

163.    Pursuant to Business & Professions Code § 17204, Plaintiffs and the Damages Class seek an order of this Court enjoining Qualcomm from continuing to engage in the acts as set forth in this Complaint, which acts constitute violations of Business & Professions Code § 17200 *et seq.* Plaintiffs, the Class and the public will be irreparably harmed if such an order is not granted.

/ / /

/ / /

/ / /

1    **X.    REQUEST FOR RELIEF**

2    WHEREFORE, Plaintiffs respectfully request that:

3        1.    The Court determine that this action may be maintained as a class action under Rule

4    23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action, as provided by Rule 23(c)(2),

5    be given to each and every member of the Class;

6        2.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and

7    decreed an unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act,

8    and the state antitrust and consumer protection laws set forth herein;

9        3.    Plaintiffs and members of the Damages Class recover damages, to the maximum

10    extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the

11    members of the Damages Classes be entered against defendants in an amount to be trebled to the

12    extent such laws permit;

13        4.    Plaintiffs and members of the Damages Class recover damages, to the maximum

14    extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully

15    gained from them;

16        5.    Defendants, their affiliates, successors, transferees, assignees and other officers,

17    directors, partners, agents and employees thereof, and all other persons acting or claiming to act on

18    their behalf or in concert with them, be permanently enjoined and restrained from in any manner

19    continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from

20    entering into any other conspiracy or combination having a similar purpose or effect, and from

21    adopting or following any practice, plan, program, or device having a similar purpose or effect;

22        6.    Plaintiffs and members of the Damages Class be awarded restitution, including

23    disgorgement of profits defendants obtained as a result of their acts of unfair competition;

24        7.    Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as

25    provided by law, and that such interest be awarded at the highest legal rate from and after the date of

26    service of this Complaint;

27        8.    Plaintiffs and members of the Classes recover their costs of suit, including reasonable

28    attorneys' fees, as provided by law; and

1      9.     Plaintiffs and members of the Classes have such other and further relief as the case

2  may require and the Court may deem just and proper.

3  Dated: February 16, 2017                    Respectfully submitted,

4                                              _____/s/ Joseph W. Cotchett_____
                                               Joseph W. Cotchett (36324)
5                                              Steven N. Williams (175489)
                                               Philip L. Gregory (95217)
6                                              Joyce Chang (300780)
                                               Adam J. Zapala (245748)
7                                              Stephanie D. Biehl (306777)
8                                              **COTCHETT, PITRE & McCARTHY, LLP**
                                               840 Malcolm Road, Suite 200
9                                              Burlingame, CA 94010
                                               Telephone: 650-697-6000
10                                             Facsimile: 650-697-0577
                                               jcotchett@cpmlegal.com
11                                             swilliams@cpmlegal.com
                                               pgregory@cpmlegal.com
12                                             jchang@cpmlegal.com
                                               azapala@cpmlegal.com
13                                             sbiehl@cpmlegal.com

14                                             *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **JURY DEMAND**

2

      Pursuant to Federal Rule of Civil Procedure 38(b), Indirect Purchaser Plaintiffs demand a jury

3

trial of all issues so triable.

4

5

Dated: February 16, 2017          Respectfully submitted,

6

                          */s/ Joseph W. Cotchett*

7

                Joseph W. Cotchett (36324)
Steven N. Williams (175489)

8

Philip L. Gregory (95217)
Joyce Chang (300780)

9

Adam J. Zapala (245748)
Stephanie D. Biehl (306777)

10

**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200

11

Burlingame, CA 94010
Telephone: (650) 697-6000

12

Facsimile: (650) 697-0577
jcotchett@cpmlegal.com

13

swilliams@cpmlegal.com
pgregory@cpmlegal.com

14

jchang@cpmlegal.com
azapala@cpmlegal.com
sbiehl@cpmlegal.com

15

16

*Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28